# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

**Donald Weed**

     v.

**Spraying Systems, Co.**

Case No. 20-cv-731-PB
Opinion No. 2022 DNH 077

## MEMORANDUM AND ORDER

Donald Weed has brought a slew of claims against his former employer, Spraying Systems. Weed alleges, among other things, that he was illegally discriminated against and retaliated against by a supervisor after a medical condition sidelined him for a short period. He now insists that Spraying Systems is liable for that supervisor's behavior under state and federal anti-discrimination law, federal medical leave protections, and common law wrongful discharge.  Spraying Systems seeks summary judgment on each count. But the record before me — seen in the light most hospitable to Weed — cannot bear that result. Weed's claims hinge on factual disputes that a reasonable jury could settle in his favor. That being so, I deny Spraying Systems's motion.

## I.    BACKGROUND[1]

---

[1] At this stage of the litigation, I must recount the facts in the light most favorable to Weed and make all reasonable inferences in his favor. See Adamson v. Walgreens Co., 750 F.3d 73, 78 (1st Cir. 2014). But I am not

Weed began working for Spraying Systems, a manufacturer of industrial spray nozzles, as a contractor in June 2014. He became a full-time employee in May 2015. Weed started as a Machinist, but after developing a rash attributed to chemicals he worked with, he transitioned into a Receiving and Weld Inspector position. In this position, Weed generally supported other departments. Eventually, Weed came to be supervised by Joe Ruelas. Ruelas, whose tenure at Spraying Systems spanned four decades, was Vice President of Operations and the second-highest ranking manager in New Hampshire. Weed's department lacked an intermediate supervisor, so Ruelas, despite his seniority, directly managed Weed.

Not long after Ruelas arrived in New Hampshire, he began expressing seemingly inexplicable frustrations with Weed. The first major incident occurred when Weed, suffering from carbon monoxide poisoning — caused by an issue with his car rather than his work at Spraying Systems — informed Ruelas that he needed to go to the hospital. In response, Ruelas "flipped out on [Weed]." See Weed Dep., Doc. No. 31-2, 18. He slammed his fist on the desk and yelled, "what the fuck . . . I need you here." Id. at 34. Weed later

---

"obliged to accept as true . . . each and every unsupported, subjective, conclusory, or imaginative statement" he has presented. See id.

testified that he was so frightened and intimidated that he decided against seeking treatment. Id.

In January 2019, Ruelas approached Weed and reprimanded him for not wearing his safety goggles. Ruelas got in Weed's face and again proceeded to "yell[] and scream[]" at him. Id. at 47; Weed Aff., Doc. No. 31-5, ¶¶ 16-17. Ruelas then walked a short distance away and continued to "laugh[] and point[]" at Weed with another employee. Weed Aff., Doc. No. 31-5, ¶ 16. Weed felt "embarrassed and ashamed" and left work early. Id. ¶ 17. Humiliated, Weed sat in his car and sobbed. Id.

One month later, in February 2019, Weed began experiencing pain in his groin and learned he had a hernia. Id. ¶ 19. Weed scheduled surgery for the end of March and submitted paperwork to Spraying Systems so he could take leave under the Family and Medical Leave Act. Id. ¶ 20. Weed expected to return by the end of April, but he developed a hydrocele (swelling caused by fluid collecting) in one of his testicles, leading to excruciating pain. See id. ¶ 21-22. These complications pushed Weed's return to May 13. Id. Weed's doctor recommended a two-week, twenty-pound lifting limit upon his return. See Doctor's Note, Doc. No. 27-25. But he continued to experience pain, especially when using the bathroom, until at least August 2019. Weed Aff., Doc. No. 31-5, ¶ 23.

While Weed was out, Ruelas checked in with him via text message. Ruelas was friendly — if not a bit morbid — asking Weed, "how are you feeling?" and joking that, if Weed didn't answer, "I will assume you died." <u>See</u> Ruelas-Weed Texts, Doc. No. 27-27. Weed wrote back that he was "fine" but that he "can't walk around much," to which Ruelas responded, "I'm glad you're fine. Take it easy." <u>Id.</u>

The day he returned to work, Weed "peeked [his] head into [Ruelas's] office" and said, "hey." <u>See</u> Weed Dep., Doc. No. 31-2, 36. Ruelas told Weed to sit down "and immediately started yelling," demanding to know why Weed "was out for so long" and "at least ten times," telling him that "he could kick [his] ass." <u>Id.</u> Weed "started panicking" and said something to the effect of "I don't think you'll do that." <u>Id.</u> at 37. Ruelas then threatened to "grab [Weed] by [his] swollen testicle, squeeze it, and kick [his] ass." <u>Id.</u> In his deposition, Weed speculated that Ruelas was attempting to goad him into responding in kind. <u>Id.</u> at 38-39. Ruelas also told Weed that while he was on leave, his replacement handled all their work just fine and urged him to quit. <u>See</u> Weed Aff., Doc. No. 31-5, ¶ 24. Weed was upset and scared and reported Ruelas's behavior to both Jodi Tracy, a Manufacturing Manager, and Scot Lightizer, the Center Leader. <u>See id.</u> ¶ 26; Weed Dep., Doc. No. 31-2, 36. Tracy encouraged Weed to document Ruelas's behavior. <u>See</u> Weed Aff., Doc. No. 31-5, ¶ 26; <u>see also</u> Weed Timeline, Doc. No. 31-13.

At some point in the next month or so, Weed was again berated by Ruelas. Another employee had suggested that employees wear hardhats on the manufacturing floor. See Tracy Dep., Doc. No. 31-4, 32-39; Weed Aff., Doc. No. 31-5, ¶ 27. Weed had previously brought up the hardhat issue in a meeting with Ruelas, among others. Id. 38-39. Later, after receiving the email about the new rules, Ruelas approached Weed and "scream[ed] in [his] face, and stated that he did not want his wife, who also worked at [Spraying Systems], to be required to wear a hardhat." Weed Aff., Doc. No. 31-5, ¶ 27. Weed told Tracy about this incident, too, but she, again, did not escalate his concerns. See Tracy Dep., Doc. No. 31-4, 38-39.

In late June, Ruelas once more harangued Weed. This time, Weed had complained about weld inspection chemical fumes not being adequately ventilated. See Weed Dep., Doc. No. 31-2, 50-51. Weed first discussed the issue with Lightizer, who suggested he "design something" to alleviate the problem. See id. at 50. Weed determined that the best route was to build a chimney to vent the fumes. See id. at 51. When he ran this idea past Ruelas, he became "extremely agitated," moving "within a foot" from Weed, balling his fists, sticking out his chest, and yelling. See id. Weed could not recall precisely what Ruelas said, but he testified that Ruelas "said the word 'fucking' so many times." See id. Eventually, Ruelas walked away. Weed testified that three employees were present for this incident. See id. at 52. He

5

named one of the employees but could not recall the two others. <u>Id.</u> at 51-52. Weed was too upset to go to work the next day. <u>Id.</u> at 55.

The final incident came a few days later, on June 26, when Weed noticed that employees were using unrated chrome sockets with a one-half-inch impact gun. See <u>id.</u> at 56. Weed understood that unrated sockets could splinter and cause severe damage, so he reached out to the chairperson of the safety committee, who agreed with Weed. <u>See id.</u> at 59; Weed Aff., Doc. No. 31-2, ¶ 30; Tracy Dep., Doc. No. 31-4, 33; Czaja Email, Doc. No. 31-17, 2. Weed was concerned that Ruelas might again react negatively to his safety concerns. Weed Aff., Doc. No. 31-5, ¶ 30. To protect himself, he asked that his report be kept anonymous. <u>Id.</u> Still, Weed was quickly confronted by an irate Ruelas, who had agreed to order replacement sockets. <u>See</u> Weed Dep., 27-3, 26. Ruelas approached Weed while he was working with another employee, Ray Raymond. He started yelling, "Fucking sockets, are you kidding me!?" <u>See</u> Weed Aff., Doc. No. 31-5, ¶ 31; Weed Dep., Doc. No. 31-2, 57. He continued, "You are fucking crazy!" and exclaimed that he "needed to punch something." <u>See</u> Weed Dep., Doc. No. 31-2, 57-58; <u>see also</u> Weed Aff., Doc. No. 31-5, ¶ 31. Ruelas continued to ball up his fists and glare at Weed. <u>See</u> Weed Dep., Doc. No. 31-2, 58. Finally, Ruelas said, in so many words, that he wanted to punch Weed "in the face." <u>See id.</u>

Weed, again overcome with anxiety and embarrassment, informed Tracy what happened. See Weed Aff., Doc. No. 31-2, ¶ 32. Tracy told Weed that he should contact the incoming General Manager, Christy Hofherr.[2] Tracy also contacted Hofherr individually. Tracy Dep., Doc. No. 31-4, 40. In her message, she warned Hofherr that "[t]here is a huge problem" she needed to "be aware of before it blows up in your face." Tracy Email, Doc. No. 31-14. She also relayed that Weed had come to her "three times about the same thing," but he "may be too afraid to speak up." Id. Weed also reached out to Hofherr via email, asking to meet. See Weed Dep., Doc. No. 31-2, 74. Hofherr and Thenin met with Weed the next day. Weed Aff., Doc. No. 31-5, 7.

As Weed filled them in about Ruelas's behavior toward him — screaming at and threatening him repeatedly — Hofherr was struck. She knew that Tracy believed Weed, and now she too found him credible. See Hofherr Dep., Doc. No. 31-7, 20, 42-43. For his part, Thenin reminded Weed that he could always call the police if he felt unsafe at work. See Thenin Dep., Doc. No. 31-10, 29. Thenin's impression of the conversation was that Weed "was trying to settle a score." See Thenin Email, Doc. No. 31-20. Thenin did

---

[2] Spraying Systems was then in the midst of a senior management change at the New Hampshire location, with Hofherr set to replace Michel Thenin, who was being transferred to a different location. See id. ¶ 32; Tracy Dep., Doc. No. 31-4, 40.

not elaborate on his suspicion beyond writing that he had "face[d] [a] situation with [Weed] a few years ago where he also seemed to have a personal agenda." See id. Thenin's sparse notes from the meeting do list the incident dates and details, such as Ruelas's threat to "punch [Weed] in the face." Thenin Notes, Doc. No. 27-34. Weed also told Thenin and Hofherr to speak with Raymond, who was present when Ruelas berated Weed about the socket issue. See Hofherr Dep., Doc. No. 31-7, 24.

When Hofherr and Thenin questioned Raymond, he proved less helpful than Weed might have hoped. Hofherr later recalled that Raymond was confused when they asked him about the incident. See id., 29-30. When Ruelas began speaking to Weed, Raymond told them he "didn't hear anything at first," and once he could make out what they were saying, he did not hear any threats. See id. According to Hofherr's deposition, Raymond's account of the interaction he witnessed was unremarkable — he did not hear any threats, Ruelas was in a good mood, and they only briefly discussed the sockets. But in Thenin's notes, Raymond apparently reported being "a distance" away from the conversation. See Doc. No. 27-34. And in his own deposition, Raymond explained that he could not hear anything Weed or Ruelas said at first because of the noise the machinery made. See Doc. No. 27-28, 7. He did say that the latter part of the conversation — the only part he observed — seemed "civil." See id. Still, he could not recall if there were

"raised voices" and ultimately testified that he didn't "remember the conversation at all, basically." See id.

Ruelas was the only other employee that Thenin and Hofherr interviewed.[3] Thenin Dep., Doc. No. 27-32, 14. They began their discussion with Ruelas by outlining Weed's complaint. Id. Ruelas explained that he just wanted to inform Weed that he would order the correct sockets and then walked away. See id.; Hofherr Dep., Doc. No. 31-7, 34. Ruelas also denied acting aggressively. Id. at 35. But Thenin's notes do quote Ruelas as saying that "Weed has not been an easy employee to deal with." Doc. No. 27-34; Thenin Dep., Doc. No. 27-32, 15. Puzzlingly, when Hofherr was asked if Ruelas said that Weed was not "an easy employee to deal with," she insisted that Ruelas "never said anything like that." Hofherr Dep., Doc. No. 31-7, 35. In fact, Hofherr testified that Ruelas always "had nothing but positive things to say about [Weed]." Id. at 34. Thenin's notes continued that Ruelas "did remember [an] altercation" over the sockets but that he "did not feel like he did anything wrong." Doc. No. 27-34; Thenin Dep., Doc. No. 27-32, 15. The interview ended with Thenin and Hofherr saying they would "follow up" with

_____

[3] Hofherr and Thenin asked some number of people, including Tracy, if they witnessed anything relevant but did not formally discuss the allegations with anybody else. See Tracy Dep., Doc. No. 31-4, 45-46; Thenin Dep., Doc. No. 27-32, 14, 16-17.

Ruelas in the "coming days." Thenin Notes, Doc. No. 27-34; Thenin Dep., Doc. No. 27-32, 15. Thenin summarized that eventual follow-up in an email to Hofherr. See Doc. No. 31-20. Ruelas agreed that he "has to be more measured when facing some situation[s]." Id. The company did no more in response to Weed's complaints and did not inform him of its decision to take no action.

Three weeks after meeting with Hofherr and Thenin, Weed started working as a welder. As a result of the move, Ruelas was no longer Weed's direct supervisor. See Weed Aff., Doc. No. 31-5, ¶ 37; Change of Status Form, Doc. No. 31-22. Weed's move was unrelated to his formal complaint and had been planned for some time. See Weed Dep., Doc. No. 31-2, 14-15; Weed Aff., Doc. No. 31-5, ¶ 38; Lightizer Dep., Doc. No. 27-10, 15; Hofherr Dep., Doc. No. 31-7, 45-47. As a welder, Weed now had an intermediate supervisor between himself and Ruelas: Scott Lightizer. See Weed Dep., Doc. No. 31-2, 14-15; Weed Aff., Doc. No. 31-5, ¶ 38. Weed had no issue with his new position, nor did he express any concerns with Lightizer as his new manager. And Hofherr's impression was that Weed was doing "a great job in welding." See Hofherr Dep., Doc. No. 31-7, 48-49. Ruelas and Weed had no negative interactions after Weed made his complaint. But Weed continued to suffer. Other employees teased him by referring to him as "Joe's Dog," which upset him. Weed Aff., Doc. No. 31-5, ¶ 38. Weed also worried that, since his complaint had seemingly amounted to nothing, and Ruelas was still his boss's

boss, he would continue to endure his wrath. See id. ¶¶ 38, 40; Weed Dep.,

Doc. No. 31-2, 64. His stress continued to build, and he felt like he was in

"constant fear." Weed Aff., Doc. No. 31-5, ¶ 38.

Weed resigned from Spraying Systems on July 29. He met with

Deborah Bartol, who was filling in as a human resources liaison, and

informed her he was quitting. See Weed Dep., Doc. No. 31-2, 81; Bartol Dep.,

Doc. No. 31-11, 6. Bartol asked if he was resigning because he was tired of

the abuse he received at Spraying Systems; Weed responded, "yes." See Weed

Dep., Doc. No. 31-5, ¶ 41. Ruelas testified that he was "disappointed" when

Weed left. See Ruelas Dep., Doc. No. 31-9, 39. On July 30, Ruelas sent a

parting text message to Weed asserting that he "left without a reason," that

Ruelas "always treated [Weed] fairly and honestly," that it was not

"considerate" for Weed to not "at least give a reason as to why [he] left after

four years." See Ruelas Texts, Doc. No. 31-23. Weed did not respond. See id.

On August 2, Ruelas sent a final text message to Weed wishing him "good

luck" going forward along with "[g]ood health, success and happiness in [his]

life." See id. Weed did not respond to this message either.

Weed eventually filed suit against Spraying Systems in New

Hampshire state court. He alleged five causes of action: (Count I) disability

discrimination under the Americans with Disabilities Act and New

Hampshire RSA 354-A, (Count II) retaliation under the same statutes as

Count I, (Count III) retaliation under the Family and Medical Leave Act, and (Count IV) common law wrongful termination. <u>See</u> Compl., Doc. No. 1-2. Spraying Systems then removed the case to federal court. <u>See</u> Notice of Removal, Doc. No. 1. Now, with the benefit of the evidence collected during discovery Spraying Systems asks me to wind up this matter by granting summary judgment in its favor on all five counts.

## II.    <u>STANDARD OF REVIEW</u>

Summary judgment motions are granted when the record leaves "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016). A fact is "material" when it has the "potential to affect the outcome of the suit." <u>See</u> Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017). A "genuine dispute" exists if a reasonable jury could resolve the disputed fact in the nonmovant's favor. <u>See</u> Ellis v. Fidelity Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018). In deciding this motion, a district court cannot engage in "differential factfinding" and is limited to making "an essentially legal determination." McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995). In doing so, I must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." <u>See</u> id.

The moving party must present evidence that "it believes demonstrates the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477

U.S. 317, 323 (1986). If the moving party satisfies this requirement, the burden shifts to the nonmoving party to identify specific facts showing that there is a genuine issue for trial and to "demonstrate that a trier of fact could reasonably resolve that issue in its favor." Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016).

## III.   <u>ANALYSIS</u>

Spraying Systems argues that it is entitled to summary judgment because: (1) Weed was not protected by the ADA or RSA 354-A, (2) Weed cannot establish that he faced a hostile work environment, (3) Weed's decision to resign did not amount to a constructive discharge, (4) Weed cannot prove that his supposed protected status motivated any alleged harassment, and (5) Weed cannot meet the public policy standard for a wrongful termination claim. Spraying Systems argues that if its first four arguments are correct, it is entitled to summary judgment on every count. Its fifth argument provides a separate justification for granting summary judgment on Weed's wrongful termination claim. Weed counters that the motion must be denied because facts material to the resolution of his claims remain in genuine dispute.

Spraying System's primary arguments fail. While Weed's case may not be rock solid, it is buttressed by the factual record and, at this stage, insulated from the sort of "differential factfinding" that a jury could

13

undertake to pick it apart. See Valentin v. Hosp. Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001).

## A.    Weed's Disability Status Is a Triable Issue of Fact

The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). [4] The First Circuit has noted, "[t]he word 'disability' is a term of art in the ADA context." Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 21 (1st Cir. 2002). Ultimately, determining whether a plaintiff is disabled under the ADA is a highly fact-specific endeavor, often ill-suited for the summary judgment stage. See, e.g., Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 872 (2d Cir. 1998); Schroeder v. Suffolk Cnty. Cmty. Coll., 2009 WL 1748869, at *9 (E.D.N.Y. June 22, 2009); Wilke v. Cole, 2014 WL 4410623, at *5 (E.D. Wis. Sept. 8, 2014).

The ADA was amended in 2008 to reject the "strict standards imposed on the definition of 'disability' by the Supreme Court." See Mancini v. City of Providence ex rel. Lombardi, 909 F.3d 32, 41 (1st Cir. 2018); see also Equal

---

[4] Weed does not dispute Spraying Systems's contention that claims brought under RSA 354-A are analyzed consonantly with the ADA. See Pl.'s Mem., Doc. No. 31-1, 17; Def.'s Mem., Doc. No. 27-1, 10 n.2 (citing Gage v. Rymes Heating Oils, Inc., 2016 DNH 038, 2016 WL 843262, at *5 n.5 (D.N.H. Mar. 1, 2016)).

Emp. Opportunity Comm'n v. BNSF Ry. Co., 902 F.3d 916, 922-23 (9th Cir. 2018). The amending act (the ADA Amendments Act of 2008) makes clear that courts must construe the definition of disability "in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A); see also Mancini, 909 F.3d at 40 ("Congress accomplished this reformation by amending the relevant provisions of the ADA to include clarifying details, rules of construction, and examples that underscore the broad applicability of the statute." (statutory citations omitted)). By "lower[ing] the bar as to what can comprise an impairment under the ADA," Congress "changed the ground rules" for what impairments can qualify as disabilities. See Mancini, 909 F.3d at 40-41.

Spraying Systems claims that the ADA does not cover Weed's inguinal hernia, post-surgical hydrocele, and surgical after-effects. Because Weed was not severely afflicted for more than "a short period" after his surgery, the argument goes, ADA protection could not have attached. See Def.'s Mem., Doc. No. 27-1, 19-20 (quoting Wanamaker v. Westport Bd. of Educ., 899 F. Supp. 2d 193, 211 (D. Conn. 2012)). Weed responds that, together with his post-surgical lifting restriction, his pain and inhibited mobility are covered by the ADA's text.[5]

---

[5] Spraying Systems has not challenged Weed's recounting of his post-surgical symptoms, and I will therefore, in viewing the record in the light most

The amended text of the ADA prevents me from granting summary judgment for Spraying Systems on the issue of Weed's disability status. The record presents uncontroverted evidence that Weed suffered from a hernia and post-surgical hydrocele, experienced pain while using the bathroom, and continues to deal with swelling that limits his mobility. See Weed Aff., Doc. No. 31-5, ¶¶ 19-23. On top of Weed's ailments qualifying as physical impairments under the statutory text, the ADA's non-exhaustive list of major life activities includes examples like "bending" and the operation of bladder and bowel functions. See 42 U.S.C. § 12102(3). Even if Weed's hernia and the effects of his surgery would not, on their own, merit ADA protection, the record contains evidence of additional, ongoing maladies. That these limitations, excluding Weed's continuing mobility issues, were short-lived is not dispositive. See Mancini, 909 F.3d at 40 (citing 29 C.F.R. § 1630.2(j)(1)(ix)). So long as a reasonable jury could conclude that Weed's ailments substantially limited a major life activity, there is a live factual dispute.

Considering the summary judgment standard and the text of the ADA, I find that Weed's disability status is a triable issue of fact for the jury. And

---

favorable to Weed, assume that further medical documentation is unnecessary at this stage. The First Circuit has held that medical evidence is not always necessary to establish an employee's disability. See Mancini, 909 F.3d 41.

while the jury may ultimately determine that Weed was not disabled, the record does not allow me to do so. See Wilke, 2014 WL 4410623, at *4-5 (denying a summary judgment motion when the plaintiff put forward evidence of a condition that causes "difficult[y] or even pain[]" when urinating).[6]

## B.   Weed's Hostile Work Environment Claim Involves Triable Factual Disputes Reserved for the Jury

For Weed to prove that he endured a hostile work environment and thereby suffered an adverse employment action, he must present evidence that shows harassment "sufficiently severe or pervasive so as to alter the conditions of his employment and create an abusive work environment." See Brader v. Biogen Inc., 983 F.3d 39, 59 (1st Cir. 2020) (cleaned up). Weed must also establish that the hostile or abusive environment was created "on account of [his] disability." See id. And the conduct, once identified, must be "both objectively and subjectively offensive, such that a reasonable person," along with Weed himself, "would find it hostile or abusive." See id. There is

---

[6] Spraying System's citation to Horsham v. Fresh Direct, 136 F. Supp. 3d 253 (E.D.N.Y. 2015), misses the mark. There, the plaintiff's complaint only made "vague references to his hernia" and did "not allege how [it] substantially limited a major life activity." Id. at 263. Seen in that context, the court's observation that a person who cannot lift "heavier objects" is not disabled simply reflects a plaintiff's obligation to plead an impairment and its effects. See id.

no "mathematically precise test" to determine when workplace conduct becomes actionable discrimination rather than a "merely offensive" indignity. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); see also Marrero, 304 F.3d at 19 (The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins.") (cleaned up). And the task of drawing such distinctions — which is done by considering the totality of the circumstances — is for the jury, "subject to some policing at the outer bounds." See Marrero, 304 F.3d at 19 (quoting Gorski v. N.H. Dep't of Corr. 290 F.3d 466, 474 (1st Cir.2002)).

Spraying Systems asserts that Weed simply has not presented enough evidence that his treatment was "sufficiently severe or pervasive" to survive summary judgment. See Brader, 983 F.3d at 59. To support its position, Spraying Systems summarizes Weed's claim as including only three incidents after his return to work and as being "wholly resolved" because the harassment "did not recur for the entire month preceding [his] resignation." See Def.'s Mem., Doc. No. 27-1, 15-16. Additionally, any name-calling ("Joe's dog") was "sporadic and indirect," according to the company. Id. at 16. Nor, as Spraying Systems argues, is there any evidence of either Ruelas acting similarly with other employees or witnesses corroborating Weed's specific allegations. Weed's response focuses mainly on the extreme threats of physical violence Ruelas made and additional bits of possibly corroborating

evidence. See Pl.'s Mem., Doc. No. 31-1, 19-20. Put succinctly, Spraying Systems believes that Weed is merely objecting to "the ordinary tribulations of the workplace, such as the sporadic use of abusive language . . . and occasional teasing." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).

Neither party emphasizes their point with helpful reference to relevant cases. But, in fairness, the standard considerations when evaluating a hostile work environment claim are individualized, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. Taking the record in the light most favorable to Weed, the evidence shows that Ruelas threatened to attack him more than once. And Spraying Systems does not present a persuasive argument that I should discount this evidence.

It is true that Raymond's testimony does not corroborate Weed's version of the "socket incident." But Raymond's testimony does not necessarily contradict Weed's version either. Weed may have been wrong when he told Hofherr and Thenin that Raymond would support his version of events. But Raymond's testimony was inconsistent and, seen in the light most favorable to Weed, suggests that he could not have heard a confrontation even if one was happening. Thenin's contemporaneous interview notes relay that Raymond was "a distance" from the conversation

between Ruelas and Weed. <u>See</u> Doc. No. <u>27-34</u>. And in his deposition, Raymond first explained that he could not hear just the beginning of the conversation, then offered that he could not recall hearing "raised voices," and ultimately conceded that he could not "remember the conversation at all." <u>See</u> Raymond Dep., Doc. No. <u>27-28</u>, 7.

Putting the utility of Raymond's testimony aside, this was only one of the times when Ruelas allegedly threatened Weed. The other threat reportedly occurred with the two alone in Ruelas's office when Weed first returned to work. Spraying System's claim that Weed's account is "unsupported by contemporaneous interviews and the sworn testimony of his coworkers and alleged witnesses" is also not borne out by the record. Nor could it be, as I noted above. Raymond's deposition testimony, where he first claimed that he did not hear any threats and that Ruelas was in a good mood, is contradicted by Thenin's contemporaneous notes. And some interactions between Weed and Ruelas are alleged to have only taken place without any witnesses present. Plus, Spraying Systems has failed to identify other direct witnesses besides Raymond. Weed testified that three employees witnessed the "chemical fumes" incident, naming one. I see no evidence from Spraying Systems concerning those employees.

I cannot agree with Spraying Systems that the alleged incidents "amount to more than sporadic moments of, at worst, incivility, and not

pervasive and continuous hostility." See Def.'s Mem., Doc. No. 27-1, 15.
According to Weed, there were four confrontations after Weed returned from
his hernia surgery: the "welcome back" dressing down in Ruelas's office and
the hardhat, fumes, and socket clashes. Cumulatively, a jury could find that
Ruelas's behavior exceeded the "ordinary tribulations of the workplace, such
as sporadic use of abusive language, gender-related jokes, and occasional
teasing." See Vera v. McHugh, 622 F.3d 17, 27 (1st Cir. 2010) (quoting
Faragher, 524 U.S. at 788).[7]

The First Circuit has noted that "incidents involv[ing] a low level of
physical violence" even if they "seem rather tame compared to many reported
cases" of hostility can serve as properly triable questions for the jury. See
Danco, Inc. v. Wal-Mart Stores, Inc., 178 F.3d 8, 16-17 (1st Cir. 1999). And "a
series of minor retaliatory actions" can amount to an objective hostile
workplace finding. See Alvarado v. Donahoe, 687 F.3d 453, 458-59 (1st Cir.
2012). Other courts have suggested that even minor actions "combined with
more aggressive incidents involving threats of violence" amount to "severe
harassment." Ahmed v. Mass. Bay Trans. Auth., 2020 WL 5260135, at *13
(D. Mass. 2020). And others have allowed hostile work environment claims to

---

[7] Vera and Faragher involve Title VII harassment claims, which use a
parallel methodology to ADA harassment claims. See Roman-Oliveras v.
Puerto Rico Elec. Power Auth., 655 F.3d 43, 51-52 (1st Cir. 2011).

go to the jury where only one incident involved the plaintiff's protected status, as is the case here. See Charette v. St. John Valley Soil & Water Conservation Dist., 332 F. Supp. 3d 316, 353 (D. Me. 2018).

With the evidence before me, I cannot say that no reasonable jury could conclude that Weed's case "rests merely upon conclusory allegations, improbable inferences, and unsupported speculation," see Alvarado, 687 F.3d at 462, as Spraying Systems insists, see Def.'s Mem., Doc. No. No. 27-1, 15. "[T]he evidence in this case, viewed in the light most favorable to the plaintiff, would permit — although certainly not compel — a reasonable jury to find that the plaintiff was subjected to a retaliation-based hostile work environment." See Noviello v. City of Boston, 398 F.3d 76, 93 (1st Cir. 2005).

## C.   Weed's Constructive Dismissal Claim Also Involves Triable Factual Disputes Reserved for the Jury

Weed argues that his decision to quit was an instance of "constructive discharge." An employee is constructively discharged when their "working conditions were so onerous, abusive, or unpleasant that a reasonable person in their position would have felt compelled to resign." Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 96 (1st Cir. 2018) (cleaned up). But the constructive dismissal theory, like in a hostile workplace claim, assumes that ordinary employees will "have reasonably thick skin" and will be able to

endure "the ordinary slings and arrows that workers routinely encounter in a hard, cold world." Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000).

Echoing its hostile workplace arguments, Spraying Systems insists that Weed was not constructively discharged, as his "resignation was premature and unnecessary." See Def.'s Mem., Doc. No. No. 27-1, 11. It makes three primary arguments: (1) there were only three alleged incidents with Ruelas, and none since Weed switched to welding; (2) Ruelas's behavior was not that offensive; and (3) any issues with Ruelas were "contained and resolved" before Weed left. Id. at 11-12. Weed argues that Ruelas's behavior was bad enough to meet the objective standard for constructive discharge, and he claims that Spraying Systems's insipid investigation forced him to resign.

Spraying Systems is correct that Weed will need to convince a jury that a reasonable person in his position would have concluded that quitting was his only choice. See E.E.O.C. v. Kohl's Dep't Stores, Inc., 774 F.3d 127, 134 (1st Cir. 2014). But that is not his burden today. To prevail, Weed must present evidence from which "a reasonable jury could find" that he had no alternative other than to resign. See Kohl's, 774 F.3d at 131 n.2; see also Record v. Hannaford Bros. Co., LLC, 561 F. Supp. 3d 202, 208 (D.N.H. 2021) (citing Ponte v. Steelcase Inc., 741 F.3d 310, 320 (1st Cir. 2014)). This evidentiary requirement demands "a greater severity or pervasiveness of

harassment than the minimum required to prove a hostile working environment." See Marrero, 304 F.3d at 28 (quoting Landgraf v. USI Film Prods., 968 F.2d 427, 430 (5th Cir.1992)).

A reasonable jury could find that continuing to work at Spraying Systems was "objectively intolerable" for Weed, "compelling [his] resignation." See Id. In Marrero, the First Circuit noted that a jury could "reasonably . . . take into account how the employer responded to the plaintiff's complaints." Id. An aggrieved employee's ability to remain at a workplace will quite reasonably hinge on "the likelihood that the harassment will continue unabated." Id.

By its own account, Spraying Systems's investigation into Ruelas was underwhelming. When Thenin and Hofherr began their investigation, Tracy, herself a supervisor, warned that Weed "may be too afraid to speak up." She also noted, without expressing any doubts about the claims, that he had come to her three times already to discuss Ruelas's treatment of him. And, for her part, Hofherr found Weed to be credible while speaking with him. The only contradictory evidence is Thenin's concern about Weed trying to settle a score, but neither Thenin nor Spraying Systems has fleshed out that argument.

Despite Weed's credibility, the ultimate thrust of the investigation was to only interview Ruelas and one witness to one incident, Raymond. Hofherr

and Thenin chose not to, for example, confront Weed with Raymond's and Ruelas's accounts of the socket incident or ask him for names of other potential witnesses. Both parties agree that Spraying Systems never told Weed that the investigation had petered out. The investigators also decided against formally interviewing Tracy or Lightizer. Thenin's notes reflect that Raymond observed Ruelas and Weed "from a distance" and could not support either version of events definitively. Ruelas's admissions to Hofherr and Thenin that it was not "easy" for him to work with Weed, that he did remember there being an "altercation," and that he needed to be "more measured when facing some situation[s]," flag at a bare minimum that Ruelas's behavior was somehow regrettable. Thenin, writing to Hofherr, summed up his feelings that even he was not sure that "there is a clear call on this one" but that it was "important" to "keep working with [Ruelas] on his approach toward the team." For her part, Hofherr only wrapped up the investigation because Raymond could not "corroborate" one of the incidents Weed told her about. She felt that her hands were tied by what was essentially a "he said, she said." In sum, the record indicates that Hofherr and Thenin found Weed compelling and expressed concerns with Ruelas's behavior but still felt comfortable ending their truncated investigation without coming to a factual conclusion.

A reasonable jury could also find that Spraying Systems's decision not to continue investigating Ruelas and not inform Weed that they had concluded their investigation could have contributed to his belief that he was still unsafe. See Marrero, 305 F.3d at 28. In fact, the only reassurance that Thenin provided Weed was that if he "was ever feeling frightened at Spraying Systems, he should call the police."

Spraying Systems also insists that Ruelas could not have been a threat to Weed because, as a welder, he would be "relieved of any continued interactions with him." But Ruelas was still Weed's ultimate supervisor. In Marrero, the plaintiff was transferred after complaining to the EEOC about her supervisor. 304 F.3d at 28. But because she would still be in the same building with her supervisor, and he would continue to go to her "work area," her harassment could continue unabated. Id. at 28-29. While here, unlike in Marrero, Weed was not subsequently harassed by Ruelas; his new position was not a safe haven such that it would be unreasonable for him to fear further interactions with Ruelas.

Spraying System's citation to Kohl's also does it no favor on this point. There, the employee "ignored" her employer's attempts to "discuss alternative accommodations." See 774 F.3d at 134-35. Spraying Systems made no such overture. And while it is true that one month passed with minimal incident, it would have been considerably less reasonable to resign right after making

his complaint to Hofherr and Thenin. See id. at 134 ("An employee is obliged

. . . not to jump to conclusions too quickly.") (cleaned up).[8] And for the reasons

I discussed above with respect to Weed's hostile workplace claim, Spraying

Systems cannot prevail in its attempts to minimize Ruelas's behavior toward

Weed.[9]

## D.   A Reasonable Jury Could Find That Weed Was Harassed And Retaliated Against Because of His Protected Status

To succeed on his ADA discrimination or retaliation claim, Weed will

have to prove that Ruelas harassed Weed "because of [his] alleged disability."

See Velez-Ramirez v. Puerto Rico, 827 F.3d 154, 157 (1st Cir. 2016). Weed

must also prove causation to establish his FMLA retaliation and

discrimination claims. See Henry v. United Bank, 686 F.3d 50, 59 (1st Cir.

2012). Questions of causation are often salient when there is a dispute about

whether an adverse employment action was pretextual. See, e.g., id. at 56.

Spraying Systems's argument is not that it had a legitimate reason for an

---

[8] Weed alleges that during his final month he was called "Joe's dog" by other employees after making his complaint. For now, I need not address whether this behavior is the sort of "simple teasing" that an employee must tolerate, see, e.g., Faragher, 524 U.S. at 788, or if it is an instance of retaliatory harassment, see, e.g., Noviello, 398 F.3d at 94.

[9] Spraying Systems asks that I consider Ruelas's friendly text messages to Weed in support of its motion. Weed need not prove — especially today — that Ruelas harassed him each time they interacted.

adverse employment action. Instead, it insists that Ruelas's alleged abuse was not motivated by Weed's protected status under either FMLA or the ADA. See Def.'s Mem., Doc. No. No. 27-1, 21. Weed responds by noting that, on his first day back at work, from FMLA leave, Ruelas was irate with him for being "out for so long" and threatened to "grab [Weed] by [his] swollen testicle, squeeze it, and kick [his] ass." Then over a short time, Ruelas continued to threaten and demean him.

Spraying Systems also notes, correctly, that Ruelas's abusive behavior began before Weed's status became protected. Those incidents included Ruelas slamming his fist on the desk when Weed asked to go to the hospital because of carbon monoxide poisoning and berating Weed for not wearing safety glasses before openly mocking him. And Spraying Systems also notes that some of Ruelas's ire was seemingly unrelated to Weed's protected status. Still, Ruelas cannot benefit from the fact that he was cruel to Weed before discriminating and retaliating against him because of his disability and leave.

When plaintiffs rely on timing as "evidence of causal connection," courts look for evidence that the "temporal proximity [was] 'very close.'" Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 25 (1st Cir. 2004) (quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001)). While three-and four-month periods are usually insufficient, see id., Weed alleges that he

28

was discriminated against and retaliated against on his first day back at work. As his burden here "is not an onerous one," this fact alone goes a long way toward establishing his prima facie case. See id. at 26. That the pace of Ruelas's demeaning behavior intensified after Weed's return provides more evidence of causation. Nor is there any requirement that Ruelas explicitly invoke Weed's protected status to support the claim that he was still motivated by that status. Between April 2017 and January 2019, Weed alleges that Ruelas aggressively confronted him twice. But in the two or so months between returning to work and resigning, Weed alleges that Ruelas violently threatened him three times.

Moreover, Spraying Systems and Ruelas have provided no alternative explanation for why else Ruelas targeted Weed. At the time of his resignation, Spraying Systems had no intention of demoting or terminating Weed. It was quite the opposite; Hofherr believed Weed was doing "a great job." A reasonable jury could find that Ruelas's behavior toward Weed was motivated by discriminatory animus with respect to his disability and retaliatory animus regarding his request for FMLA leave.[10]

_____

[10] Spraying Systems is incorrect that Weed cannot bring an ADA retaliation claim because his leave was approved using FMLA paperwork and was not a reasonable disability accommodation. Its citation to Morin v. Hannaford Bros. Co., LLC, 2018 WL 2746570 (D. Me. June 7, 2018) is plainly unavailing. As the court in Morin explained, "unpaid leave provided as a reasonable accommodation may . . . be considered both as FMLA leave and an ADA

**E.     Weed Could Meet the Public Policy Element for Wrongful Termination**

In New Hampshire, an employer is liable for wrongful discharge if the plaintiff's termination was "motivated by bad faith, retaliation, or malice" and was because the employee performed "an act that public policy would encourage or refused "to do something that public policy would condemn." Clark v. N.H. Dep't of Emp. Sec., 201 A.3d 652, 659 (N.H. 2019). If the employee can establish that they were constructively discharged, their claim can proceed as if they were terminated. Lacasse v. Spaulding Youth Ctr., 910 A.2d 1262, 1265 (N.H. 2006). Whether a legitimate public policy is implicated is typically a question for the jury. Short v. School Admin. Unit No. 16, 612 A.2d 364 (N.H. 1992). But when there is clearly no public policy implicated, the court can "take the question away from the jury." Id.

Spraying Systems first argues that Weed's wrongful termination claim cannot be predicated on alleged retaliation for his decision to take time off or for his disability status. For that point, it cites Duhy v. Concord Gen. Mut. Ins. Co., 2009 DNH 074, 2009 WL 1650024 (D.N.H. June 10, 2009). But Duhy only held that there were no public policy implications when an employee asks to "take vacation days or file health insurance claims through the policy

reasonable accommodation for purposes of determining an employee's rights under both statutes." Id. at *12.

offered by their employer." See id. at *10. Weed's claims, in contrast, are expressly based on his request for FMLA leave and his protected status under the ADA.

Next, Spraying Systems turns to the New Hampshire Supreme Court's edict that a plaintiff "may not pursue a common law remedy where the legislature intended to replace it with a statutory cause of action." Wenners v. Great State Beverages, Inc., 663 A.2d 623, 625 (N.H. 1995). Even if Spraying Systems is correct that the ADA and FMLA denote such intent, Weed also argues that his complaints about improperly ventilated fumes and faulty sockets represent a "wide range of societal goals including safety" and thereby implicate public policy. See Hidalgo-Semlek v. Hansa Med., Inc., 498 F. Supp. 3d 236, 249 (D.N.H. 2020). Spraying Systems does not dispute that such a policy could exist. Given the "multifaceted balancing process" for determining "[t]he existence of a public policy," this issue is "is properly left to the jury." Cloutier v. Great Atl. & Pac. Tea Co., 436 A.2d 1140, 1145 (N.H. 1981); see also Grivois v. Wentworth-Douglass Hosp., 2014 DNH 017, 2014 WL 309354, at *9 (D.N.H. Jan. 28, 2014) (denying defendant's motion for summary judgment on a wrongful termination claim where "public policy encouraged [the plaintiff] to inform her supervisors" about company decisions that "endangered the safety of others.").

## IV.   <u>CONCLUSION</u>

Spraying Systems's motion fails to satisfy the summary judgment standard. After reciting the facts in the light most favorable to Weed, I conclude that outstanding issues of material fact permeate the case. The exact circumstances that led to Weed's decision to resign are very much disputed. To settle the matter, I would have to engage in precisely the kind of "differential factfinding" that I am barred from performing. <u>See</u> <u>McCarthy, 56 F.3d at 315</u>. Accordingly, Spraying System's motion for summary judgment (Doc. No. <u>27</u>) is denied.

SO ORDERED.

<u>/s/ Paul J. Barbadoro</u>
Paul J. Barbadoro
United States District Judge

July 5, 2022

cc:   Counsel of Record